**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

```
-----------------------------x
                             :
DANA ALYCE POOLE            :    Civ. No. 3:19CV00927(SALM)
                             :
v.                           :
                             :
ANDREW M. SAUL,             :
COMMISSIONER, SOCIAL SECURITY :
ADMINISTRATION              :    May 22, 2020
                             :
-----------------------------x
```

<u>**RULING ON CROSS MOTIONS**</u>

Plaintiff Dana Alyce Poole ("plaintiff"), brings this appeal under §205(g) of the Social Security Act (the "Act"), as amended, 42 U.S.C. §405(g), seeking review of a final decision by the Commissioner of the Social Security Administration (the "Commissioner" or "defendant") denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). Plaintiff has moved to reverse the Commissioner's decision. [Doc. #23]. Defendant has filed a cross-motion seeking an order affirming the decision of the Commissioner. [Doc. #27].

For the reasons set forth below, plaintiff's Motion to Reverse the Decision of the Commissioner [**Doc. #23**] is **DENIED,** and defendant's Motion for an Order Affirming the Decision of the Commissioner [**Doc. #27**] is **GRANTED.**

  
# I.   <u>PROCEDURAL HISTORY</u>[1]

Plaintiff filed applications for DIB and SSI on December 7, 2012, alleging disability beginning on March 1, 2012. <u>See</u> Certified Transcript of the Administrative Record, Doc. #15, compiled on July 29, 2019, (hereinafter, collectively, "Tr.") at 175-86. Plaintiff's applications were denied initially on May 17, 2013, <u>see</u> Tr. 136-43, and upon reconsideration on October 29, 2013. <u>See</u> Tr. 145-47.

On March 3, 2015, plaintiff, represented by Attorney Ivan M. Katz, appeared and testified at a hearing before Administrative Law Judge ("ALJ") Deirdre R. Horton. <u>See generally</u>, Tr. 43-88. On June 26, 2015, the ALJ issued an unfavorable decision. <u>See</u> Tr. 23-41. On September 21, 2016, the Appeals Council denied plaintiff's request for review of the ALJ's June 26, 2015, decision. <u>See</u> Tr. 1-5.

On November 30, 2016, plaintiff, still represented by Attorney Katz, filed a complaint in the United States District Court for the District of Connecticut seeking review of the ALJ's June 26, 2015, decision. <u>See</u> <u>Poole v. Colvin</u>, No. 3:16CV01959(MPS) (D. Conn. Nov. 30, 2016). On March 20, 2018,

---

[1] Simultaneously with her motion, plaintiff filed a Statement of Material Facts. [Doc. #23-1]. Defendant filed a Responsive Statement of Facts, in which he "generally concurs with Plaintiff's Statement of Material Facts," but "supplements and clarifies certain paragraphs" set forth in that document. Doc. #27-1 at 1.

defendant filed a Motion for Entry of Judgment Under Sentence Four of 42 U.S.C. §405(g) with Reversal and Remand of the Cause to Defendant. Id. at Doc. #25. On March 21, 2018, Judge Michael P. Shea granted that motion and entered judgment in favor of plaintiff. See id. at Docs. #26, #27; see also Tr. 911. On May 8, 2018, the Appeals Council issued a Notice of Order of Appeals Council Remanding Case to Administrative Law Judge. See Tr. 912-18.

Following the Appeals Council's remand, on January 31, 2019, plaintiff, again represented by Attorney Katz, appeared and testified at a second hearing before ALJ Horton. See generally Tr. 839-82. Vocational Expert ("VE") Edmond J. Calandra appeared and testified by telephone at the hearing. See Tr. 867-80; see also Tr. 1181-82. On March 25, 2019, the ALJ issued a second unfavorable decision. See Tr. 815-38. Plaintiff did not seek Appeals Council review of the ALJ's March 25, 2019, decision. See Doc. #1 at 4. Accordingly, the ALJ's March 25, 2019, decision became the final decision of the Commissioner on May 27, 2019. See Tr. 816 ("If you do not file written exceptions and the Appeals Council does not review [the ALJ's] decision on its own, [the ALJ's] decision will become final on the 61st day following the date of this notice."). The case is now ripe for review under 42 U.S.C. §405(g).

II.  __STANDARD OF REVIEW__

The review of a Social Security disability determination involves two levels of inquiry. <u>First</u>, the Court must decide whether the Commissioner applied the correct legal principles in making the determination. <u>Second</u>, the Court must decide whether the determination is supported by substantial evidence. <u>See</u> <u>Balsamo v. Chater</u>, 142 F.3d 75, 79 (2d Cir. 1998). Substantial evidence is evidence that a reasonable mind would accept as adequate to support a conclusion; it is more than a "mere scintilla." <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971) (quoting <u>Consolidated Edison Co. v. NLRB</u>, 305 U.S. 197, 229 (1938)). The reviewing court's responsibility is to ensure that a claim has been fairly evaluated by the ALJ. <u>See</u> <u>Grey v. Heckler</u>, 721 F.2d 41, 46 (2d Cir. 1983).

The Court does not reach the second stage of review – evaluating whether substantial evidence supports the ALJ's conclusion – if the Court determines that the ALJ failed to apply the law correctly. <u>See</u> <u>Norman v. Astrue</u>, 912 F. Supp. 2d 33, 70 (S.D.N.Y. 2012) ("The Court first reviews the Commissioner's decision for compliance with the correct legal standards; only then does it determine whether the Commissioner's conclusions were supported by substantial evidence." (citing <u>Tejada v. Apfel</u>, 167 F.3d 770, 773-74 (2d Cir. 1999))). "Where there is a reasonable basis for doubt

4

whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles." Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987).

"[T]he crucial factors in any determination must be set forth with sufficient specificity to enable [a reviewing court] to decide whether the determination is supported by substantial evidence." Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984) (alterations added) (citing Treadwell v. Schweiker, 698 F.2d 137, 142 (2d Cir. 1983)). The ALJ is free to accept or reject the testimony of any witness, but a "finding that the witness is not credible must nevertheless be set forth with sufficient specificity to permit intelligible plenary review of the record." Williams ex rel. Williams v. Bowen, 859 F.2d 255, 260-61 (2d Cir. 1988) (citing Carroll v. Sec. Health and Human Servs., 705 F.2d 638, 643 (2d Cir. 1983)). "Moreover, when a finding is potentially dispositive on the issue of disability, there must be enough discussion to enable a reviewing court to determine whether substantial evidence exists to support that finding." Johnston v. Colvin, No. 3:13CV00073(JCH), 2014 WL 1304715, at *6 (D. Conn. Mar. 31, 2014).

It is important to note that in reviewing the ALJ's decision, this Court's role is not to start from scratch. "In reviewing a final decision of the SSA, this Court is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." Talavera v. Astrue, 697 F.3d 145, 151 (2d Cir. 2012) (quoting Lamay v. Comm'r of Soc. Sec., 562 F.3d 503, 507 (2d Cir. 2009)). **"[W]hether there is substantial evidence supporting the appellant's view is not the question here; rather, we must decide whether substantial evidence supports the ALJ's decision**." Bonet ex rel. T.B. v. Colvin, 523 F. App'x 58, 59 (2d Cir. 2013) (summary order).

Finally, some of the Regulations cited in this decision, particularly those applicable to the review of medical source evidence, were amended effective March 27, 2017. Those "new regulations apply only to claims filed on or after March 27, 2017." Smith v. Comm'r, 731 F. App'x 28, 30 n.1 (2d Cir. 2018) (summary order). Where a plaintiff's claim for benefits was filed prior to March 27, 2017, "the Court reviews the ALJ's decision under the earlier regulations[.]" Rodriguez v. Colvin, No. 3:15CV01723(DFM), 2018 WL 4204436, at *4 n.6 (D. Conn. Sept. 4, 2018); White v. Comm'r, No. 17CV04524(JS), 2018 WL 4783974, at *4 n.4 (E.D.N.Y. Sept. 30, 2018) ("'While the Act was amended effective March 27, 2017, the Court reviews the ALJ's decision

6

under the earlier regulations because the Plaintiff's application was filed before the new regulations went into effect.'" (citation omitted)).

III. <u>**SSA LEGAL STANDARD**</u>

Under the Social Security Act, every individual who is under a disability is entitled to disability insurance benefits. 42 U.S.C. §423(a)(1).

To be considered disabled under the Act and therefore entitled to benefits, plaintiff must demonstrate that she is unable to work after a date specified "by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). Such impairment or impairments must be "of such severity that [s]he is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §423(d)(2)(A); 20 C.F.R. §§404.1520(c), 416.920(c) (requiring that the impairment "significantly limit[] ... physical or mental ability to do basic work activities" to be considered "severe" (alterations added)).

7

There is a familiar five-step analysis used to determine if a person is disabled. See 20 C.F.R. §§404.1520, 416.920. In the Second Circuit, the test is described as follows:

> First, the Secretary considers whether the claimant is currently engaged in substantial gainful activity. If [s]he is not, the Secretary next considers whether the claimant has a "severe impairment" which significantly limits [her] physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Secretary will consider [her] disabled without considering vocational factors such as age, education, and work experience; the Secretary presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity.

Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam). If and only if the claimant does not have a listed impairment, the Commissioner engages in the fourth and fifth steps:

> Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, [s]he has the residual functional capacity to perform [her] past work. Finally, if the claimant is unable to perform [her] past work, the Secretary then determines whether there is other work which the claimant could perform. Under the cases previously discussed, the claimant bears the burden of proof as to the first four steps, while the Secretary must prove the final one.

Id.

"Through the fourth step, the claimant carries the burdens of production and persuasion, but if the analysis proceeds to

the fifth step, there is a limited shift in the burden of proof and the Commissioner is obligated to demonstrate that jobs exist in the national or local economies that the claimant can perform given [her] residual functional capacity." Gonzalez ex rel. Guzman v. Dep't of Health and Human Serv., 360 F. App'x 240, 243 (2d Cir. 2010) (alteration added); Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009) (per curiam). The residual functional capacity ("RFC") is what a person is still capable of doing despite limitations resulting from her physical and mental impairments. See 20 C.F.R. §§404.1545(a)(1), 416.945(a)(1).

"In assessing disability, factors to be considered are (1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." Bastien v. Califano, 572 F.2d 908, 912 (2d Cir. 1978). "[E]ligibility for benefits is to be determined in light of the fact that 'the Social Security Act is a remedial statute to be broadly construed and liberally applied.'" Id. (quoting Haberman v. Finch, 418 F.2d 664, 667 (2d Cir. 1969)).

IV.  **THE ALJ'S DECISION**[2]

Following the above-described evaluation process, the ALJ concluded that plaintiff "has not been under a disability, as defined in the Social Security Act, from March 1, 2012, through the date of this decision[.]" Tr. 829; see also Tr. 819. At step one, the ALJ found that plaintiff had not engaged in substantial gainful activity since the alleged onset date of March 1, 2012. See Tr. 820. At step two, the ALJ found that plaintiff had the severe impairments of "obesity; osteoarthritis of the knees and back; degenerative disc disease of the lumbar spine; chronic obstructive pulmonary disease (COPD); [and] depressive disorder[.]" Tr. 821. The ALJ found plaintiff's history of substance abuse and bilateral carpal tunnel syndrome to be non-severe impairments. See id. The ALJ also found plaintiff's obstructive sleep apnea to be a "non-medically determinable[]" impairment. Id.

At step three, the ALJ determined that plaintiff's impairments, either alone or in combination, did not meet or medically equal the severity of any of the listed impairments in 20 C.F.R. Pt. 404, Subpt. P, App. 1. See Tr. 821-23. The ALJ specifically considered whether: (1) plaintiff's "physical impairments" met or medically equaled Listing 1.02 (major

---

[2] References to the ALJ's decision refer to the ALJ's decision dated March 25, 2019. See Tr. 815-38.

dysfunction of a joint); (2) plaintiff's multi-level degenerative disc disease met or medically equaled Listing 1.04 (disorders of the spine); and (3) plaintiff's COPD met or medically equaled Listing 3.02 (chronic respiratory disorders). See Tr. 821-22. The ALJ also "considered the effects of obesity on all of the claimant's physical and mental impairments." Tr. 822. Finally, the ALJ evaluated whether plaintiff's mental impairments, considered singly and in combination, met or medically equaled the criteria of Listing 12.04 (affective disorders). See Tr. 822-23.

The ALJ next found that plaintiff had the RFC

to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except occasional posturals; she should avoid concentrated exposures to respiratory irritants such as dusts, fumes, gases, etc. She is limited to simple routine tasks; she needs a cane for prolonged ambulation.

Tr. 823. At step four, the ALJ concluded that plaintiff was "unable to perform any past relevant work[.]" Tr. 827. At step five, after considering plaintiff's age, education, work experience, and RFC, as well as the testimony of the VE, the ALJ found that jobs existed in significant numbers in the national economy that plaintiff could perform. See Tr. 828-29.

## V.   **DISCUSSION**

Plaintiff timely filed this action for review and moves to reverse the decision of the Commissioner. [Doc. #23]. Plaintiff argues: (1) the ALJ failed to properly apply the treating physician rule; (2) the ALJ failed to properly evaluate plaintiff's complaints of pain; (3) the RFC determination failed to include certain limitations; and (4) the Commissioner failed to meet his burden at step five. See generally Doc. #23-2 at 1-17. For the reasons that follow, the Court affirms the decision of the Commissioner.

### A.   Treating Physician Rule

Plaintiff contends that the ALJ failed to properly apply the treating physician rule. See generally id. at 1-7. Plaintiff specifically takes issue with the weight assigned to the opinions of Dr. Michael Wong, Dr. Stavros Sidiropoulos, Dr. Sarah Olivier, and Dr. Nancy Kelly. See id. Defendant contends that the ALJ assigned appropriate weight to the medical opinion evidence. See generally Doc. #27-2 at 6-13.[3]

#### 1.   *Applicable Law*

"The SSA recognizes a 'treating physician' rule of deference to the views of the physician who has engaged in the primary treatment of the claimant," Green-Younger, 335 F.3d at 106. According to this rule, the opinion of a claimant's treating physician as to the nature and severity of the impairment is given "controlling weight" so long as it "is well-supported by

---

[3] Throughout this Ruling, the Court refers to the pagination reflected in the ECF heading of the parties' briefing.

> medically acceptable clinical and laboratory diagnostic
> techniques and is not inconsistent with the other
> substantial evidence in the case record." 20 C.F.R.
> §404.1527(d)(2); see, e.g., Green-Younger, 335 F.3d at
> 106; Shaw, 221 F.3d at 134.

Burgess v. Astrue, 537 F.3d 117, 128 (2d Cir. 2008); see also 20

C.F.R. §§404.1527(c), 416.927(c). If the opinion, however, is

not "well-supported" by "medically acceptable" clinical and

laboratory diagnostic techniques, then the opinion cannot be

entitled to controlling weight. 20 C.F.R. §§404.1527(c)(2),

416.927(c)(2).

When weighing any medical opinion, treating or otherwise,

the Regulations require that the ALJ consider the following

factors: length of treatment relationship; frequency of

examination; nature and extent of the treatment relationship;

relevant evidence used to support the opinion; consistency of

the opinion with the entire record; and the expertise and

specialized knowledge of the treating source. See 20 C.F.R.

§§404.1527(c)(2)-(6), 416.927(c)(2)-(6); Social Security Ruling

("SSR") 96-2P, 1996 WL 374188, at *2 (S.S.A. July 2, 1996); SSR

06-03P, 2006 WL 2329939, at *3-4 (S.S.A. Aug. 9, 2006). The

Second Circuit does not, however, require a "slavish recitation

of each and every factor [of 20 C.F.R. §§404.1527(c),

416.927(c)] where the ALJ's reasoning and adherence to the

regulation are clear." Atwater v. Astrue, 512 F. App'x 67, 70

(2d Cir. 2013) (citing <u>Halloran v. Barnhart</u>, 362 F.3d 28, 31-32
(2d Cir. 2004) (<u>per curiam</u>)).

### 2. *Dr. Michael Wong*

Plaintiff appears to take issue with the ALJ's reasons for
assigning limited weight to the opinion of Dr. Michael Wong. <u>See</u>
Doc. #23-2 at 2-3. Plaintiff also appears to assert that the ALJ
should have contacted Dr. Wong to obtain a function-by-function
assessment of plaintiff's abilities. <u>See id.</u> at 3. Defendant
responds that the ALJ appropriately assigned little weight to
Dr. Wong's opinion, and factored some of Dr. Wong's assessments
into the RFC determination. <u>See</u> Doc. #27-2 at 7.

Dr. Wong completed a Physical Capacity Statement dated
March 7, 2014 (hereinafter the "Wong Opinion"). Tr. 581-85. The
Wong Opinion notes plaintiff's diagnoses of lumbar disc syndrome
and cervical radiculopathy, and her symptoms of neck and back
pain, and right arm numbness. <u>See</u> Tr. 581. The form on which the
Wong Opinion is provided asks a series of questions concerning
plaintiff's functional abilities. <u>See</u> Tr. 582-85. Dr. Wong
crossed out each of those questions and wrote "NOT WORKING[,]"
or something similar. Tr. 582-85.

In addressing the medical opinion evidence, the ALJ stated
that she "grant[ed] weight according to opinions that are
supported by sufficient documentation of evidence, clear
articulation for the basis of the opinions, and consistent

14

findings with other objective medical evidence of record." Tr. 826. With respect to the Wong Opinion specifically, the ALJ assigned "little weight to the opinions of Dr. Wong (Exhibit 13F and duplicate 34F) which does not provide a function-by-function analysis. Instead, he crossed off a lot of the questions and wrote 'not working.' The undersigned finds that this assessment provides very little probative value." Tr. 827.

Plaintiff asserts: "It is clear that Dr. Wong was unwilling to opine on Ms. Poole's capacity to perform work-related activities in that she was not working. But this provides no warrant for the ALJ to dismiss as insubstantial the opinions Dr. Wong did, in fact, state." Doc. #23-2 at 3.

Some courts in this Circuit have found that "a failure to provide a 'function-by-function assessment' is not a basis for discounting a medical opinion." Doyle v. Berryhill, No. 5:16CV00024(GWC), 2017 WL 2364312, at *6 (D. Vt. May 31, 2017); see also Laureano v. Comm'r of Soc. Sec., No. 1:17CV01347(SDA), 2018 WL 4629125, at *16 (S.D.N.Y. Sept. 26, 2018). Nevertheless, here, even if discounting the Wong Opinion on this basis was error, any such error was harmless, for several reasons. See Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987) ("[W]here application of the correct legal principles to the record could lead to only one conclusion, there is no need to require agency reconsideration.").

First, the Wong Opinion states that plaintiff "is unable to obtain and retain work in a competitive work environment, 8 hours per day, 5 days per week[.]" Tr. 585. It is well established, however, that "whether [plaintiff] qualifies as disabled under the statute is a decision reserved to the Commissioner." LaValley v. Colvin, 672 F. App'x 129, 130 (2d Cir. 2017) (citation and quotation marks omitted); see also Snell v. Apfel, 177 F.3d 128, 133-34 (2d Cir. 1999) ("The final question of disability is ... expressly reserved to the Commissioner."). Accordingly, that aspect of the Wong Opinion was entitled to no weight.

Second, the Wong Opinion states that plaintiff should elevate her left leg with prolonged sitting. See Tr. 583. The better that a medical opinion is explained and supported by relevant evidence, the more weight it should be given. See 20 C.F.R. §§404.1527(c)(3), 416.927(c)(3). Dr. Wong provided no explanation for this opinion. See Tr. 583. Additionally, Dr. Wong's contemporaneous treatment records do not support such a limitation. See, e.g., Tr. 587-88 (January 20, 2014, treatment record noting "L4-S1 tenderness with paraspinal muscle spasm" and "increased pain" with lateral bending, but no indication that plaintiff required leg elevation); Tr. 1969 (March 7, 2014 treatment record, reflecting back and neck pain on examination, but no indication that plaintiff required leg elevation). Other

16

evidence of record also does not support this restriction. For example, plaintiff's other treating physician, Dr. Sarah Olivier, opined just the opposite -- that plaintiff did <u>not</u> require leg elevation. <u>See</u> Tr. 1469. Objective evidence also does not support Dr. Wong's conclusion on this point. <u>See, e.g.</u>, Tr. 573 (December 14, 2012, x-ray of left ankle: "Unremarkable ankle"); Tr. 303 (December 14, 2012, x-ray of left knee reflecting "mild to moderate degenerative change"); Tr. 486 (September 27, 2013, x-ray of knees reflecting "[b]ilateral degenerative joint disease, left greater than right, without significant change" from December 14, 2012, imaging); Tr. 609 (August 1, 2014, x-ray of left foot: "There is a questionable chip fracture from the dorsal aspect of one of the distal phalanges, only seen in lateral view. No additional fracture or dislocation is seen.").

Accordingly, <u>in addition</u> to discounting the Wong Opinion because it failed to provide a function-by-function assessment, the ALJ appropriately assigned little weight to that opinion because it was not "supported by sufficient documentation of evidence," did not contain "clear articulation for the basis of the opinions, and" was not "consistent ... with other objective medical evidence of record." Tr. 826. The Court is therefore able to glean from the record the ALJ's rationale for assigning little weight to the Wong Opinion, and that conclusion is

17

supported by substantial evidence. Accordingly, any purported error in the ALJ's reasoning is harmless. See also Petrie v. Astrue, 412 F. App'x 401, 406-07 (2d Cir. 2011) (no error where the court could "glean the rationale of [the] ALJ's decision" from the evidence of record, and "application of the correct legal standard could lead to only one conclusion" (internal citations omitted)).[4]

Finally, plaintiff asserts that the ALJ should have contacted Dr. Wong to "seek his opinions relative to Ms. Poole's function-by-function abilities." Doc. #23-2 at 3. "Assessing whether it was legal error for an ALJ to fail to request clarification from a treating physician is a case-specific inquiry that turns on whether an ALJ could reach an informed decision based on the record." Prince v. Berryhill, 304 F. Supp. 3d 281, 289 (D. Conn. 2018). Here, the ALJ could readily reach an informed decision based on the record, which is comprised of 2,764 pages, the majority of which are medical records. There are also several other opinions of record, including one from Dr. Olivier that provides a function-by-function assessment of plaintiff's physical abilities. See Tr. 1467-71. Accordingly,

---

[4] The Wong Opinion also states that plaintiff required a cane for prolonged ambulation. See Tr. 583. The ALJ appears to have credited that portion of the Wong Opinion, as she expressly stated in the RFC determination that plaintiff "needs a cane for prolonged ambulation." Tr. 823.

the ALJ was not required to contact Dr. Wong for a function-by-function assessment of plaintiff's physical abilities.

### 3.   Dr. Stavros Sidiropoulos[5]

Plaintiff next takes issue with the ALJ's reasons for discounting the opinion of Dr. Stavros Sidiropoulos. See Doc. #23-2 at 3-4.

Dr. Sidiropoulos completed a Mental Capacity Statement dated July 28, 2016 (hereinafter the "Sidiropoulos Opinion").[6] See Tr. 1196-99. Dr. Sidiropoulos generally assessed plaintiff with little to no impairments in her mental abilities. See generally id. Dr. Sidiropoulos also identified several physical impairments "that would affect [plaintiff's] ability to work at a regular job on a competitive and sustained basis[.]" Tr. 1198. Dr. Sidiropoulos concluded that plaintiff would likely be absent from work five days or more per month as a result of her impairments and/or her need for ongoing medical treatment. See

---

[5] Both defendant and the ALJ refer to Dr. Sidiropoulos as "Dr. Sidipoulos[.]" Tr. 827; see also Doc. #27-2 at 9. The Court uses the spelling of Dr. Sidiropoulos that is reflected on the July 28, 2016, mental capacity statement. See Tr. 1199.

[6] The ALJ did not explicitly state the weight assigned to the Sidiropoulos Opinion. However, the Court is able to glean that the ALJ assigned limited weight to that opinion. See Hanchett v. Colvin, 198 F. Supp. 3d 252, 262-63 (W.D.N.Y. 2016) ("Although the ALJ did not assign any specific weight to the ... opinion of LMSW Faraco, any error ... is harmless because the Court is able to glean the ALJ's reasoning[.]"). Plaintiff does not raise error on this specific point, and therefore, the Court does not consider any such argument.

id. He also concluded that, on average, plaintiff likely would be unable to complete an eight-hour workday five or more days per month, as a result of her impairments and/or her need for ongoing medical treatment. See id. Dr. Sidiropoulos next opined that "compared to an average worker," plaintiff would be expected to perform at less than 50 percent efficiency on a sustained basis. Tr. 1199.

    With respect to the Sidiropoulos Opinion, the ALJ stated:

> [Dr. Sidiropoulos] and Jay Berkowitz, completed a medical source statement in July 2016 (Exhibit 23F). They gave very mild mental limitations (less than 5% limitations) but then stated that she would be absent 5 or more days from work and unable to perform tasks more than 50% of the time. This is internally inconsistent. Moreover, it is unclear as to why she would be so frequently absent from work, and it notes that it is based upon statements made by the claimant. It is also noted that the form indicates both physical and mental limitations, where they were only treating her for mental health issues.

Tr. 827.

    Plaintiff appears to assert that the ALJ misread the Sidiropoulos opinion: "The Record supports the proposition that it is the treatment for her conditions, perhaps more than the conditions themselves, which would cause Ms. Poole to miss work ... five or more times per month. This is not in any manner 'internally inconsistent.'" Doc. #23-2 at 4 (emphasis removed). Defendant responds that the ALJ properly assigned little weight to the Sidiropoulos Opinion "because it was internally

inconsistent, was based largely on Plaintiff's unreliable and subjective statements, and it included physical limitations despite the fact that Dr. Sidipoulos provided only psychological treatment." Doc. #27-2 at 9 (sic).

The Sidiropoulos Opinion is not as clear as plaintiff contends. The form on which the opinion is provided asks: "Please estimate, on the average, how many days per month your patient is likely to be absent from work as a result of her physical and/or mental impairments and/or her need for ongoing and periodic medical treatment and care for them." Tr. 1198 (alterations in original). Dr. Sidiropoulos merely checked a box responding "5 days or more" -- he did not specify which of the reasons provided would cause plaintiff's absenteeism. Id. A plain reading of the Sidiropoulos Opinion suggests that plaintiff's absenteeism could be based on plaintiff's impairments as opposed to her need for treatment. Indeed, the Sidiropoulos Opinion references plaintiff's physical and mental limitations, as well as her complaints of pain, in several locations. See Tr. 1196-98. The ALJ acknowledged that lack of clarity in her decision. See Tr. 827 ("[I]t is unclear as to why she would be so frequently absent from work[.]"). Thus, to the extent plaintiff contends that the record supports the proposition that plaintiff's treatment would cause her

absenteeism, that is simply an alternative reading of the record.

Nevertheless, the ALJ properly discounted the Sidiropoulos Opinion because it is internally inconsistent. See Micheli v. Astrue, 501 F. App'x 26, 28 (2d Cir. 2012) (ALJ "properly declined to accord controlling weight to the opinion of" plaintiff's treating physician where the opinion was "internally inconsistent and inconsistent with other substantial record evidence[.]"). As correctly noted by defendant, although Dr. Sidiropoulos opined that plaintiff could not be expected to perform full-time work on a sustained basis when compared to an average worker, he also opined, inter alia, that plaintiff had no limitations in her abilities to: (1) "[m]aintain attention and concentration for extended periods of time[;]" (2) "[c]arry out detailed instructions[;]" (3) "[c]omplete a normal workday and workweek without interruptions from psychologically based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods[;]" and (4) "[r]espond appropriately to changes in the workplace[.]" Tr. 1197-98. Such divergent opinions are not reconcilable.

Plaintiff next asserts:

The ALJ does not appear to have grasped the plain fact: That with intensive outpatient therapy and a powerful "cocktail" of "psych meds" Ms. Poole is able to function with that the ALJ calls "very mild mental limitations;"

22

but that were such intrusive treatment to be withdrawn,
a prompt and steep deterioration would result.

Doc. #23-2 at 4. Neither plaintiff, nor the record, provides any

support for such an assertion.

Finally, the Sidiropoulos Opinion concerning plaintiff's

absenteeism and ability to efficiently perform a job on a full-

time basis (when compared to an average worker) are not

consistent with other portions of the record, including numerous

unremarkable mental status examinations from 2016, the year Dr.

Sidiropoulos authored his opinion. See, e.g., Tr. 2540, Tr.

2549, Tr. 2552, Tr. 2556.

Accordingly, the ALJ appropriately assigned limited weight

to the Sidiropoulos opinion, and provided good reasons for doing

so.[7]

### 4. Dr. Olivier

Plaintiff next appears to assert that the ALJ failed to

provide good reasons for assigning little weight to the opinion

of plaintiff's treating physician, Dr. Sarah Olivier. See Doc.

#23-2 at 4.

---

[7] In discussing the Sidiropoulos Opinion, the ALJ did not
explicitly discuss each of the factors set forth in 20 C.F.R.
§§404.1527(c)(2)-(6), 416.927(c)(2)-(6). However, because the
ALJ was not required to do so, there is no error. See Atwater,
512 F. App'x at 70; Cichocki v. Astrue, 534 F. App'x 71, 76 (2d
Cir. 2013) ("[R]emand is not required where 'the evidence of
record permits us to glean the rationale of an ALJ's
decision[.]'" (quoting Mongeur v. Heckler, 722 F.2d 1033, 1040
(2d Cir. 1983))).

Dr. Olivier completed a Physical Capacity Statement dated May 29, 2018 (hereinafter the "Olivier Opinion"). <u>See</u> Tr. 1467-71. With respect to this opinion, the ALJ stated:

> In May 2018, Sarah Olivier, M.D., noted that the claimant was limited to standing and walking for 1 hour in an 8 hour day and sitting for three hours (Exhibit 32F). The treatment notes of Hill Health Center do not support this degree of limitation (Exhibits 25F-29F). As discussed above, the claimant has had only conservative treatment for her back pain and was given a knee brace for mild to moderate degenerative changes. She reported that her knee pain improved after bariatric surgery. The undersigned has given little weight to Dr. Olivier's assessment, as it is not supported by the treatment notes.

Tr. 827.

Plaintiff asserts that the ALJ failed to explicitly apply the "<u>Burgess</u> factors" to the Olivier Opinion. Doc. #23-2 at 5-6. Plaintiff also appears to assert that the ALJ erroneously concluded plaintiff had received conservative treatment for her back and knee pain. <u>See</u> <u>id.</u> at 5. Defendant responds that the ALJ assigned little weight to the "restrictive portions" of the Olivier Opinion "because it was inconsistent with Plaintiff's treatment notes and the overall record." Doc. #27-2 at 8. Defendant also observes that "[t]he ALJ generally acknowledged Dr. Olivier's opinion as one from a treating source (Tr. 826), and explicitly considered her treatment notes from Hill Health Center, which reflect her ongoing treatment relationship with Plaintiff." <u>Id.</u>

To reiterate, the Regulations require that an ALJ consider certain factors when weighing medical opinion evidence from a treating physician. See 20 C.F.R. §§404.1527(c)(2)-(6), 416.927(c)(2)-(6). The ALJ, however, is not required to explicitly discuss each factor, provided that her decision and the evidence of record allows the Court to glean the ALJ's rationale. See Atwater, 512 F. App'x at 70; Cichocki, 534 F. App'x at 76.

First, it is apparent from the ALJ's decision that the ALJ considered Dr. Olivier's status as a treating physician, along with the nature of her treatment relationship with plaintiff. The ALJ explicitly stated that she "considered the medical opinions provided by treating and examining sources[.]" Tr. 826. The Olivier Opinion itself states that Dr. Olivier had seen plaintiff "[e]very 3-4m for the past 2 yr." Tr. 1467 (sic). The ALJ explicitly considered Dr. Olivier's treatment notes. See Tr. 827 (citing Exhibits 25F to 29F, reflected at pages 1242-90 of the record). The ALJ also considered other records from Hill Health Center throughout her decision. See, e.g., Tr. 825 (citing Exhibit 48F, reflected at pages 2212-37 of the record); Tr. 826 (citing Exhibits 44F and 49F, reflected at pages 2140-54 and 2238-43 of the record). Accordingly, the Court is able to glean from the ALJ's decision that she adequately considered the nature, length, and frequency of examination when considering

the Olivier Opinion. See, e.g., Daniel v. Berryhill, No. 3:17CV01015(SALM), 2018 WL 2128380, at *6 (D. Conn. May 9, 2018) (finding that the ALJ implicitly considered a treating physician's relationship with plaintiff where the ALJ "explicitly considered [the physician's] treatment notes throughout his decision[]").

It is also apparent that the ALJ considered both the quantity of medical evidence supporting the Olivier Opinion and the consistency of the Olivier Opinion with the other medical evidence. After summarizing the evidence of record, see Tr. 821-26, the ALJ stated that she granted weight to the opinion evidence according to whether the opinion was "supported by sufficient documentation of evidence ... and consistent ... with other objective medical evidence of record." Tr. 826. With respect to the Olivier Opinion specifically, the ALJ concluded that the treatment notes of Hill Health Center did not support the conclusion that plaintiff was limited to standing and walking for one hour, and sitting for three hours, in an eight-hour workday. See Tr. 827. This conclusion is supported by the record. Notably, on May 14, 2018, Dr. Olivier examined plaintiff "for work." Tr. 1462. The physical examination on that date was largely normal, and noted, in pertinent part: "Lower back exam normal and knee exam mild pain medially on varus test left knee." Tr. 1465 (sic). Dr. Olivier concluded that plaintiff

could "fulfill her [job as] a aide lifting weight ... to 50 lbs." Id. (sic). Prior to the date of her Opinion, Dr. Olivier regularly recommended that plaintiff start or continue an exercise regimen. See Tr. 1366, Tr. 1376, Tr. 1405; see also Tr. 2139 (July 26, 2018, treatment note recommending that plaintiff "[i]ncrease exercise[.]").

Other evidence of record, including physical examinations close in time to the Olivier Opinion, also do not support the restrictive limitations set forth therein. See, e.g., Tr. 1240 (April 2018 examination reflecting mild findings and noting plaintiff had a "normal steady" gait); Tr. 2108 (May 2018 examination reflecting mild findings and noting plaintiff had a "normal steady" gait); Tr. 2111 (June 2018 examination reflecting mild findings and noting plaintiff had a "normal steady" gait). Other objective evidence, including diagnostic imaging reports, generally reflects mild to moderate findings and does not support the level of restriction set forth in the Olivier Opinion. See, e.g., Tr. 1289 (September 2017 MRI of lumbar spine showing "mild spinal canal stenosis and mild bilateral neuroforaminal stenosis."); Tr. 2210 (September 2018 bilateral knee x-ray showing "[m]inimal tricompartmental degenerative changes[.] ... There is no joint effusion.").[8]

---

[8] The record also reflects that at various points throughout the relevant time period, plaintiff worked as a certified nurse's

Finally, plaintiff asserts that the ALJ erroneously discounted the Olivier Opinion on the ground that plaintiff received conservative treatment for her neck and back pain. See Doc. #23-2 at 5. Assuming, without deciding, that the ALJ's reliance on plaintiff's conservative treatment was erroneous, the Court finds no error here given the other "good reasons" provided for assigning little weight to the Olivier Opinion.

Thus, for the reasons stated, the ALJ properly assigned little weight to the Olivier Opinion and provided good reasons for doing so; specifically, that it was unsupported by objective findings and inconsistent with treatment notes and other objective medical evidence of record. See Tr. 826-27; see also Atwater, 512 F. App'x at 70.[9]

### 5.   Dr. Kelly

Finally, plaintiff contends that the ALJ erred by assigning great weight to the opinion of consultative examiner Dr. Nancy Kelly. See Doc. #23-2 at 6. Defendant responds: "[T]he ALJ appropriately gave great weight to Dr. Kelly's Opinion, as she

---

aide or home companion. See, e.g., Tr. 860-61, Tr. 867-68, Tr. 2107, Tr. 2113. This also undermines the extent of limitations set forth in the Olivier Opinion.

[9] There is no evidence of record that Dr. Olivier is a specialist. If anything, the record suggests that she is a generalist, having overseen plaintiff's recovery from bariatric surgery and having treated plaintiff's complaints of back and knee pain. See, e.g., Tr. 1242-41, Tr. 1467-71.

is a specialist in psychology who personally examined Plaintiff, her opinion is well supported by her examination findings, and it is consistent with other record evidence." Doc. #27-2 at 13.

On October 21, 2013, Dr. Kelly conducted a psychological evaluation of plaintiff. See Tr. 464-68. Dr. Kelly opined, in pertinent part, that "there is no evidence of limitation for following and understanding simple directions and instructions or performing simple tasks independently. There is no evidence of limitation for maintaining attention or a regular schedule[.]" Tr. 466-67. The ALJ assigned "great weight" to Dr. Kelly's opinion that plaintiff "could perform simple work" because "it is supported by her examination findings, showing that [plaintiff's] attention and concentration were intact[.]" Tr. 827.

The Second Circuit has "cautioned that ALJs should not rely heavily on the findings of consultative physicians after a single examination." Selian, 708 F.3d at 419. Nevertheless, an ALJ is permitted to "choose between properly submitted medical opinions[.]" Balsamo, 142 F.3d at 81. Indeed, "a consulting psychiatric examiner's opinion may be given great weight and may constitute substantial evidence to support a decision. ... It is also generally accepted that a consultative examiner's opinion may be accorded greater weight than a treating source's opinion where the ALJ finds it more consistent with the medical

evidence." <u>Colbert v. Comm'r of Soc. Sec.</u>, 313 F. Supp. 3d 562, 577 (S.D.N.Y. 2018) (internal citations omitted).

Having appropriately discounted the Sidiropoulos Opinion, <u>see</u> Section V.A.3., <u>supra</u>, the ALJ permissibly assigned great weight to the opinion of Dr. Kelly. Not only is the opinion supported by Dr. Kelly's examination of plaintiff, <u>see</u> Tr. 466, but the conclusion that plaintiff is capable of simple work is also supported by other substantial evidence of record. <u>See</u> Tr. 439 (September 2013 mental status examination reflecting intact thought process and content, normal long term memory, and intact judgment); Tr. 742, 744 (January 2014 mental status examinations reflecting intact thought process, no impairment in perception, and intact judgment); Tr. 750 (March 2014 mental status examination reflecting normal orientation, memory, and attention/concentration); Tr. 1513 (November 2015 mental status examination reflecting normal attention/concentration); Tr. 2325 (April 2015 mental status examination reflecting good concentration); Tr. 2331 (June 2015 mental status examination reflecting good concentration); Tr. 2552 (June 2016 mental status examination reflecting logical thought process and good attention/concentration); Tr. 2540 (November 2016 mental status examination reflecting logical thought process and good attention/concentration) Tr. 2674 (May 2018 mental status examination reflecting intact thought process, logical/coherent

thought content, and good attention/concentration); Tr. 2683
(August 2018 mental status examination reflecting intact thought
process, logical/coherent thought content, and good
attention/concentration); Tr. 2692 (October 2018 mental status
examination reflecting intact thought process, logical/coherent
thought content, and good attention/concentration).

Accordingly, substantial evidence supports the ALJ's
assignment of great weight to the opinion of Dr. Kelly, and
there is no error.

B.   Credibility Determination/Evaluation of Pain

Next, plaintiff asserts that the ALJ failed to properly
evaluate her subjective complaints of pain. See Doc. #23-2 at 8-
10. Defendant responds that the ALJ "properly evaluated the
consistency of [plaintiff's] statements regarding her symptoms
with the record as a whole, in accordance with the regulatory
framework." Doc. #27-2 at 14.

1.   Applicable Law

Although "the subjective element of pain is an important
factor to be considered in determining disability[,]" Mimms v.
Heckler, 750 F.2d 180, 185 (2d Cir. 1984) (citation omitted), an
ALJ is not "required to credit [plaintiff's] testimony about the
severity of her pain and the functional limitations it caused."
Rivers v. Astrue, 280 F. App'x 20, 22 (2d Cir. 2008). "The ALJ
has discretion to evaluate the credibility of a claimant and to

31

arrive at an independent judgment, in light of medical findings and other evidence, regarding the true extent of the pain alleged by the claimant." Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1979); Snell, 177 F.3d at 135.

"Credibility findings of an ALJ are entitled to great deference and therefore can be reversed only if they are patently unreasonable." Pietrunti v. Dir., Office of Workers' Comp. Programs, 119 F.3d 1035, 1042 (2d Cir. 1997) (quotation marks and citation omitted). The Regulations set forth a two-step process that an ALJ must follow in evaluating a plaintiff's subjective complaints. First, the ALJ must determine whether the record demonstrates that plaintiff possesses a "medically determinable impairment that could reasonably be expected to produce [plaintiff's] symptoms, such as pain." 20 C.F.R. §§404.1529(b), 416.929(b). Second, the ALJ must assess the credibility of plaintiff's complaints regarding "the intensity and persistence of [plaintiff's] symptoms" to "determine how [the] symptoms limit [plaintiff's] capacity for work." 20 C.F.R. §§404.1529(c), 416.929(c); see also SSR 16-3P, 2017 WL 5180304 (S.S.A. Oct. 25, 2017) (describing two-step process used to evaluate a claimant's subjective symptoms).[10]

---

[10] "SSR 16-3p, which became effective March 28, 2016, supersedes SSR 96-7p, which was promulgated in 1996. On October 25, 2017, the SSA republished SSR 16-3p, detailing how to apply the ruling as it relates to the applicable date. Specifically, the SSA

The ALJ should consider factors relevant to plaintiff's symptoms, such as pain, including: (1) the claimant's daily activities; (2) the "location, duration, frequency, and intensity" of the claimant's pain or other symptoms; (3) any precipitating or aggravating factors; (4) the "type, dosage, effectiveness, and side effects of any medication" taken by claimant to alleviate the pain or symptoms; (5) "treatment, other than medication," that plaintiff has received for relief of pain or other symptoms; (6) any other measures plaintiff has used to relieve symptoms; and (7) other factors concerning plaintiff's "functional limitations and restrictions due to pain or other symptoms." 20 C.F.R. §§404.1529(c)(3), 416.929(c)(3). The ALJ must consider all evidence in the case record. See SSR 16-3P, 2017 WL 5180304, at *8.

### 2. Analysis

The ALJ summarized plaintiff's testimony, in pertinent part, as follows:

> The claimant alleges that she has pain in her knees and low back. She testified that the back pain is constant and is in her left, lower back. Her knee pain radiates to her feet and affects walking. She uses a cane, 2-3 times per week for balance and ambulation.

---

indicated that adjudicators should apply SSR 16-3p rather than SSR 96-7p when making a determination on or after March 28, 2016." Kearney v. Berryhill, No. 1:16CV00652(MAT), 2018 WL 5776422, at *5 (W.D.N.Y. Nov. 2, 2018). Because the ALJ's decision is dated March 25, 2019, SSR 16-3p applies here. See id.

Tr. 824. After a "careful consideration of the evidence," the ALJ found "that the [plaintiff's] medically determinable impairments could reasonably be expected to cause the alleged symptoms[,]" but that plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in [the ALJ's] decision." Tr. 824

The ALJ adequately considered plaintiff's complaints of pain. Not only did the ALJ reference plaintiff's back and knee pain throughout her decision, see Tr. 824-25, but the ALJ also appears to have credited some of those complaints by limiting plaintiff to sedentary work and acknowledging plaintiff's need for a cane with prolonged ambulation. See Tr. 823.

Although the ALJ did not entirely credit plaintiff's complaints of pain, upon evaluation of the ALJ's decision and the record, the Court concludes that the ALJ appropriately considered the regulatory factors when assessing plaintiff's subjective complaints. See Martes v. Comm'r of Soc. Sec., 344 F. Supp. 3d 750, 767 (S.D.N.Y. 2018) ("An ALJ need not, however, explicitly address each and every statement made in the record that might implicate her evaluation of a claimant's credibility as 'the evidence of record permits us to glean the rationale of an ALJ's decision.'" (quoting Cichocki, 534 F. App'x at 76)).

First, the ALJ specifically addressed the objective medical evidence, which generally showed mild to moderate findings, and did not support plaintiff's allegations of disabling pain. See Tr. 824 (summarizing MRIs and radiographs of plaintiff's back and knees). The ALJ also noted an examination where plaintiff demonstrated "full strength to the upper and lower extremities." Id.[11] An ALJ may properly discount a claimant's subjective complaints where they conflict with the objective evidence of record. See, e.g., Penfield v. Colvin, 563 F. App'x 839, 840 (2d Cir. 2014) (ALJ did not commit reversible error where "[a]fter extensively detailing the medical evidence and [plaintiff's] testimony, the ALJ afforded her statements only partial credibility because they were inconsistent with the objective evidence in the record." (quotation marks omitted)); Feliciano Velez v. Berryhill, No. 3:18CV01101(SALM), 2019 WL 1468141, at *13 (D. Conn. Apr. 3, 2019) ("[T]he ALJ properly considered the consistency of plaintiff's subjective statements with the objective medical evidence, including diagnostic imaging, which 'displayed generally mild abnormalities in her shoulder, wrist, lumbar and cervical spine,

---

[11] This is but one of many records reflecting full strength of plaintiff's lower extremities and/or a relatively normal physical examination of plaintiff's musculoskeletal system. See, e.g., Tr. 291-92, Tr. 382, Tr. 398, Tr. 692, Tr. 706-07, Tr. 1229, Tr. 1294, Tr. 1332, Tr. 1338.

without evidence of stenosis, nerve root compromise, or joint instability." (quotation marks omitted)).

Second, the ALJ explicitly considered plaintiff's treatment and medication, including that: plaintiff had "attended physical therapy for her knee pain and ha[d] been prescribed knee braces[,]" Tr. 824; plaintiff had received chiropractic treatment for her back, see Tr. 825; plaintiff had received pain medications from the Pain Care Center and New Solutions, see id.; conservative measures had been recommended for plaintiff's back pain, see id.; and plaintiff used a cane at times, see id. Additionally, when discussing plaintiff's back and knee pain, the ALJ extensively cited to treatment notes from plaintiff's pain management providers. See Tr. 824 (citing Exhibits 24F, 40F, and 52F (treatment records from New Solutions)); Tr. 825 (citing Exhibits 17F, 18F (treatment records from Pain Care Center)), and Exhibits 24F, 40F, 46F, and 52F (treatment records from New Solutions)).[12]

---

[12] Plaintiff also appears to take issue with the ALJ's consideration of plaintiff's "conservative" treatment. See Doc. #23-2 at 10. "While conservative treatment alone is not grounds for an adverse credibility finding, the ALJ may take it into account along with other factors." Rivera v. Comm'r of Soc. Sec., 368 F. Supp. 3d 626, 646 (S.D.N.Y. 2019), appeal dismissed (May 31, 2019). Here, the ALJ considered plaintiff's purported conservative treatment, along with other factors, to find her complaints of disabling pain not entirely credible. Accordingly, there is no error.

Third, the ALJ explicitly noted plaintiff's self-report that weight loss from bariatric surgery had "helped her bilateral knee pain[.]" Id. The ALJ also cited to a treatment note from the Pain Care Center that plaintiff was "functioning reasonably well." Tr. 825 (citing Exhibit 17F, pg. 11). Other evidence of record similarly reflects plaintiff's reports that she was functioning reasonably well and/or feeling "good." Tr. 2000; see also, e.g., Tr. 2320 ("Patient able to maintain adequate functional status with good pain control."); Tr. 2205 ("Functional status: able to perform ADL[.]"). Indeed, plaintiff worked as a nurse's aide at various times during the relevant time period. See, e.g., Tr. 2205 ("Got a job, doing HHA/home health care. Pt. states work gives her more pain[.]"); Tr. 1183 (work history); Tr. 758 ("Needs physical for new job as CNA/Home health aide. No longer receiving unemployment."); Tr. 204 (description of plaintiff's job as a nurse's aide). Such statements, and plaintiff's ability to work intermittently, also undermine plaintiff's claims of disabling pain.

"When determining a claimant's RFC, the ALJ is required to take the claimant's reports of pain and other limitations into account ... but is not required to accept the claimant's subjective complaints without question; [s]he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record." Genier

37

v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (citations omitted).
Here, the ALJ properly considered the consistency of plaintiff's
subjective complaints with the other evidence of record.
Moreover, the ALJ had the opportunity to personally observe
plaintiff and her testimony, something the Court cannot do.
Accordingly, the Court finds no error in the ALJ's assessment of
plaintiff's credibility.[13]

C.   The RFC Determination

Although raised as part of her step five argument,
plaintiff appears to contend that the RFC determination fails to
account for certain limitations and/or is not supported by
substantial evidence. See Doc. #23-2 at 16-17. Specifically,
plaintiff asserts that the ALJ: (1) failed to provide any
restrictions related to plaintiff's history of carpel tunnel
syndrome; (2) failed to sufficiently account for plaintiff's
asthma and COPD; and (3) failed to account for plaintiff's
moderate limitation in concentration, persistence, and pace. See
id. Defendant generally responds that the RFC determination is
supported by substantial evidence. See Doc. #27-2 at 21-22.

---

[13] The ALJ did not specifically address each of the regulatory
factors when assessing plaintiff's credibility. However, because
the ALJ discussed several of the regulatory factors, such an
omission does not constitute reversible error. See, e.g., Martin
v. Astrue, 337 F. App'x 87, 90 (2d Cir. 2009) (no error where
ALJ considered only three of seven regulatory factors).

A plaintiff's RFC is "the most [she] can still do despite [her] limitations." 20 C.F.R. §§404.1545(a)(1), 416.945(a)(1). The RFC is assessed "based on all the relevant evidence in [the] case record[,]" including "all of the relevant medical and other evidence." 20 C.F.R. §§404.1545(a)(1), (3), 416.945(a)(1), (3). Bearing this in mind, the Court turns to each of plaintiff's claimed errors.

### 1. Manipulative Limitations

Plaintiff contends that the ALJ erred by failing to include any manipulative limitations in the RFC, "despite [plaintiff's] documented history of carpal tunnel syndrome." Doc. #23-2 at 16. Defendant responds that the ALJ correctly found plaintiff's carpal tunnel syndrome to be a non-severe impairment without any ongoing limitations, and argues that plaintiff has failed to establish any additional limitations stemming from this impairment. See Doc. #27-2 at 21.

With respect to plaintiff's carpal tunnel syndrome, the ALJ stated:

> The claimant has been treated for bilateral carpal tunnel syndrome (Exhibit 15F, pg. 6). She underwent right endoscopic carpal tunnel release in August 2014 (Exhibit 15F, pg. 12) and left release in October 2014 (Exhibit 33F, pg. 438). The record does not reflect ongoing limitations. Therefore, the undersigned finds carpal tunnel to be nonsevere.

Tr. 821. Substantial evidence supports this conclusion.

39

In 2014, following plaintiff's carpal tunnel release surgery on her right hand, plaintiff's "[s]ymptoms resolved[.]" Tr. 624; see also Tr. 789 (March 10, 2015, treatment record: "Recovered from Rt hand carpal tunnel repair[.]"). Records from 2015 reflect that plaintiff had full grip strength, 5/5 strength, and "full wrist range of motion[]" in both her left and right hands. Tr. 706, Tr. 710.

Plaintiff testified at the January 2019 hearing that her carpal tunnel release surgery did not work, and that her "hands still get numb[.]" Tr. 855. A 2017 treatment note indicates that plaintiff's carpal tunnel was "likely recurring[,]" but did not indicate any functional limitations as a result. Tr. 1404. The record generally fails to reflect any post-surgery limitations with respect to manipulation. In that regard, it is well settled that the ALJ is "entitled to rely not only on what the record says, but also on what it does not say." Dumas v. Schweiker, 712 F.2d 1545, 1553 (2d Cir. 1983). Additionally, plaintiff fails to point to any evidence suggesting that she has any functional limitations as a result of her carpal tunnel syndrome.[14] Even if she did, "where substantial evidence also supports the ALJ's determination, that determination must be

_____

[14] Indeed, the Olivier Opinion, to which the plaintiff would assign controlling weight, concluded that plaintiff did not have "significant limitations with reaching, handling or fingering[.]" Tr. 1470.

affirmed." <u>Rivera v. Berryhill</u>, No. 3:18CV00143(AWT), 2019 WL
1292490, at *8 (D. Conn. Mar. 21, 2019). Accordingly, the ALJ
did not err by failing to include manipulative limitations in
the RFC determination.

2.   *Environmental Limitations*

Plaintiff next asserts: "[T]he mere restriction to the
avoidance of 'concentrated exposure' to irritants is not
sufficient to account for Ms. Poole's asthma and COPD." Doc.
#23-2 at 16. As previously indicated, the ALJ found plaintiff's
COPD to be a severe impairment, and, as a result, included in
the RFC that plaintiff "should avoid concentrated exposures to
respiratory irritants such as dusts, fumes, gases, etc." Tr.
823.

Plaintiff does not cite to any evidence supporting a
greater environmental limitation than that provided for in the
RFC. Treatment notes from 2014 reflect that plaintiff's COPD was
generally stable and/or controlled with medication. <u>See</u> Tr. 715,
Tr. 719, Tr. 723. Although some later treatment records note
plaintiff's wheezing on examination, <u>see</u> Tr. 811, Tr. 2022,
there is nothing to suggest that plaintiff requires a greater
environmental limitation than that set forth in the RFC. <u>See,
e.g.,</u> Tr. 99 (non-examining physician's opinion that plaintiff
should "[a]void concentrated exposure" to "[f]umes, odors,
dusts, gases, poor ventilation, etc."); Tr. 127 (same, on

41

reconsideration). Indeed, although the Olivier Opinion noted plaintiff's COPD diagnosis, it did not require that plaintiff "avoid ... dust[ and] fumes[.]" Tr. 1470.

Accordingly, substantial evidence supports the ALJ's RFC determination with respect to environmental limitations.

### 3. *Concentration, Persistence, and Pace*

Plaintiff next contends that the ALJ should have included a limitation regarding concentration, persistence, and pace. See Doc. #23-2 at 16. Plaintiff contends:

> [T]he ALJ found "moderate limitation" in Ms. Poole's ability to persist at a work task, in the ability to perform at a commercially acceptable pace, and in the ability to concentrate on work tasks (R. 822). ... The ALJ did not account for this "moderate limitation" in concentration, persistence or pace in ... the residual functional capacity finding (R. 823).

Id. at 16-17. Defendant responds, in pertinent part, that "the ALJ considered Plaintiff's severe mental impairments and appropriately accounted for them by limiting plaintiff to routine, simple, unskilled sedentary work." Doc. #27-2 at 22.

At step three, with regard to the "paragraph B" criteria used to assess mental impairments, the ALJ found that plaintiff suffered from "moderate limitations[]" in concentration, persistence, and pace. Tr. 822-23. Notably, however, assessments of "limitations and restrictions from mental impairment at steps two and three are not an RFC assessment." A. H. v. Comm'r of Soc. Sec., No. 5:17CV00385(WBC), 2018 WL 3369663, at *6

(N.D.N.Y. July 9, 2018). The ALJ explicitly acknowledged that in her decision:

> The limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process. The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process require a more detailed assessment.

Tr. 823. "Accordingly, to the extent Plaintiff contends that the ALJ was required to expressly include the moderate limitations (in concentration, persistence and pace) identified at Step 3 in the RFC determination, such argument lacks merit because the ALJ's findings at step 3 of the sequential analysis are not an RFC determination." Coleman v. Comm'r of Soc. Sec., 335 F. Supp. 3d 389, 402 (W.D.N.Y. 2018) (citation and quotation marks omitted).

    Nevertheless, the ALJ ultimately limited plaintiff to "simple routine tasks[.]" Tr. 823. For reasons previously stated, that restriction generally comports with the evidence of record concerning plaintiff's ability to maintain concentration, persistence, and pace. See Section B.A.5., supra. This limitation also sufficiently accounts for plaintiff's impairments in her ability to sustain concentration, persistence, or pace. See, e.g., McIntyre v. Colvin, 758 F.3d 146, 152 (2d Cir. 2014) ("Here, substantial evidence in the record demonstrates that McIntyre can engage in 'simple,

routine, low stress tasks,' notwithstanding her physical limitations and her limitations in concentration, persistence, and pace. By explicitly limiting the hypothetical to such tasks (after fully explaining McIntyre's physical restrictions), the ALJ sufficiently accounted for 'the combined effect of McIntyre's impairments." (citation and internal quotation marks omitted)); Coleman, 335 F. Supp. 3d at 401 ("[T]he ALJ limited Plaintiff to performing only work that requires sufficient attention and concentration to understand, remember and follow simple instructions. This finding is fully consistent with the observation that Plaintiff has moderate limitations in concentration, persistence, and pace." (citation and quotation marks omitted)); Bendler-Reza v. Colvin, No. 3:15CV01576(JAM), 2016 WL 5329566, at *7 (D. Conn. Sept. 22, 2016) ("As to her claim that the ALJ should have limited Plaintiff's RFC to account for inability to maintain attention, pace, persistence, and concentration, the ALJ noted that plaintiff had 'mild memory problems and mildly impaired concentration, which would limit [plaintiff] to performing simple work.' The RFC thus accounts for this limitation."). Accordingly, there is no error.

      D.    The ALJ's Step Five Analysis

      Last, plaintiff asserts that substantial evidence does not support the ALJ's findings at step five of the sequential evaluation. See Doc. #23-2 at 10-17. Specifically, plaintiff

asserts that: (1) the VE's testimony was not supported by substantial evidence because his methodology for determining the job incidence numbers was unreliable; (2) the job incidence numbers identified by the VE during his testimony are "a mathematical impossibility[;]" and (3) the hypothetical posed to the VE was defective. Id. at 12-14.

### 1. Applicable Law

The Regulations provide: "At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work." 20 C.F.R. §§404.1520(a)(4)(v), 416.920(a)(4)(v). "At step five the burden shifts to the Commissioner to show there is other gainful work in the national economy which the claimant could perform." Butts v. Barnhart, 388 F.3d 377, 383 (2d Cir. 2004), as amended on reh'g in part, 416 F.3d 101 (2d Cir. 2005) (citation and quotation marks omitted). The "ALJ may make this determination either by applying the Medical Vocational Guidelines or by adducing testimony of a vocational expert." McIntyre, 758 F.3d at 151.

### 2. The VE's Methodology

After finding that plaintiff could not perform any past relevant work, see Tr. 827, the ALJ determined that "there are jobs that exist in significant numbers in the national economy that [plaintiff] can perform." Tr. 828. In reaching this

45

conclusion, the ALJ adopted the VE's testimony that plaintiff "would be able to perform the requirements of representative occupations such as:" (1) call center operator (50,000 jobs nationally); (2) credit clerk (40,000 jobs nationally); and (3) jewelry painter (1,500 jobs nationally). Id.; see also Tr. 868-69.

In response to questioning by the ALJ, the VE testified that he obtained the above-referenced job numbers from the United States Bureau of Labor Statistics, and that he did not change those numbers. See Tr. 870-71. The VE also testified that the job numbers provided by the Bureau of Labor Statistics comported with his experience regarding the number of jobs available in the marketplace. See Tr. 871.[15] Plaintiff's counsel cross-examined the VE concerning his methodology used to arrive at those numbers, see Tr. 871-90, and submitted a post-hearing brief on that issue, see Tr. 1190-95.

Plaintiff challenges the VE's methodology, which she contends "produces a mathematically impossible result[,]" and therefore, is not reliable. Doc. #23-2 at 13. Specifically, plaintiff contends that the job incidence numbers identified by

---

[15] The ALJ "[c]onsidered counsel's objections to the vocational expert testimony," and found "the vocational expert offered reliable testimony regarding the numbers of available jobs in the national and local economy." Tr. 829.

the VE were taken from the Occupational Employment Statistics
published by the Bureau of Labor Statistics, and that "the
Occupational Employment Statistics reports employment numbers by
referring to Standard Occupational Classifications – and not by
DOT numbers[.]" Doc. #23-2 at 11. Plaintiff thus contends that
"it is impossible to square [the VE's] explicit testimony that
he has relied on the Bureau of Labor Statistics' Occupational
Employment Statistics for his job incidence testimony, and his
testimony that he relied on something else entirely." Id. at 12.
Defendant responds that "the vocational expert's testimony
cleared the substantial evidence bar." Doc. #27-2 at 16.
Defendant further asserts that plaintiff's argument has been
rejected by the United States Supreme Court in Biestek v.
Berryhill, 139 S. Ct. 1148 (2019), as well as other Courts in
this Circuit. See id. at 18-19.

    "An ALJ does not err when he relies on a vocational
expert's testimony that is based on personal experience, labor
market surveys, and published statistical sources in determining
the number of jobs available." Debiase v. Saul, No.
3:19CV00068(RMS), 2019 WL 5485269, at *11 (D. Conn. Oct. 25,
2019). Further, "it is sufficient that the vocational expert
identified the sources he generally consulted to determine" job
incidence numbers. Lyde v. Berryhill, No. 3:17CV00094(JAM), 2018
WL 4678574, at *4 (D. Conn. Sept. 29, 2018) (citation and

47

quotation marks omitted). "[A]bsent any applicable regulation or decision requiring a vocational expert to identify with greater specificity the source of his figures or to provide supporting documentation, it is enough that a vocational expert identify the sources he generally consulted to determine such figures." Harper v. Berryhill, No. 3:16CV01168(SALM), 2017 WL 3085806, at *16 (D. Conn. July 20, 2017) (citations and quotation marks omitted).[16]

"This approach is rooted in the 'extremely flexible' nature of the 'substantial evidence' standard which 'gives federal courts the freedom to take a case-specific, comprehensive view of the administrative proceedings, weighing all the evidence to determine whether it was "substantial."'" Debiase, 2019 WL 5485269, at *11 (quoting Brault v. Soc. Sec. Admin., Com'r, 683 F.3d 443, 449 (2d Cir. 2012)). The United States Supreme Court has recently confirmed that in this context, the threshold of "substantial" evidence "is not high[,]" but rather, it is "more than a mere scintilla[,]" and "means ... such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Biestek, 139 S. Ct. at 1154 (citations and quotation marks omitted).

---

[16] The ALJ explicitly noted that proposition in her decision. See Tr. 829.

48

Courts in this District have noted some concern with the type of methodology employed by the VE here in response to similar arguments raised by plaintiff's counsel. See, e.g., Debiase, 2019 WL 5485269, at *11 ("[T]he Court is sensitive to the plaintiff's concern about the vague nature of Hall's testimony regarding his methodology in arriving at the job incidence numbers for the positions he identified[.]"); Cortes v. Berryhill, No. 3:16CV01910(JCH), 2018 WL 1392903, at *11 (D. Conn. Mar. 19, 2018) ("By exposing the vocational expert's flawed calculations, Cortes has illustrated the dubious methodology used to arrive at the number of jobs in the economy.").[17] Nevertheless, the majority of those courts have declined to find error at step five because "[t]o date, the Second Circuit does not require a detailed scrutiny of a vocational expert's methods." Debiase, 2019 WL 5485269, at *11; see also Cortes, 2018 WL 1392903, at *11 ("[T]he vocational expert need not provide the exact number of jobs available for a

---

[17] One case, Kelly v. Berryhill, No. 3:17CV01703(VLB), 2019 WL 1332176 (D. Conn. March 25, 2019), considered a vocational expert's methodology and found that because it contained multiple flaws, it did not support the ALJ's step five finding. See id. at *17. Kelly appears to be an outlier amongst the decisions in this District. Indeed, because Kelly was decided before Biestek, which "changes the landscape meaningfully," Mott v. Saul, No. 3:19CV00733(SALM), Doc. #24, slip op. at 33 (D. Conn. Feb. 24, 2020) (hereinafter "Mott"), the Court finds Kelly unpersuasive.

position." (citations omitted)). These conclusions are further bolstered by the conclusion in Biestek that a VE's testimony concerning job incidence numbers may constitute substantial evidence, even when the supporting data underlying that conclusion is not disclosed. See Biestek, 139 S. Ct. at 1157.

Here, the VE's testimony clears the relatively low substantial evidence bar. The VE testified that his data and figures were derived from the United States Bureau of Labor Statistics. See Tr. 870, Tr. 872-73, Tr. 878-79. The VE also testified that the job incidence numbers comported with his experience regarding the number of jobs available in the marketplace. See Tr. 871.[18] Finally, the VE explained the methodology he used to arrive at the job incidence numbers to which he testified. See Tr. 876, Tr. 878-79.

"The VE submitted his credentials, identified the sources he used to arrive at his conclusions, and fully explained his methodology. ... The Court therefore finds that the ALJ reasonably relied on the VE's expertise." Harper, 2017 WL 3085806, at *16; see also Crespo v. Comm'r of Soc. Sec., No. 3:18CV00435(JAM), 2019 WL 4686763, at *9 (D. Conn. Sept. 25,

---

[18] The VE's resume indicates that he has "[t]hirty years experience providing vocational and disability consulting services" and has been employed as an independent vocational consultant since 1997. Tr. 1181 (sic). The VE's resume was admitted as an exhibit during the administrative hearing. See Tr. 866.

2019) ("[T]he substantial evidence standard does not foreclose an ALJ from relying on the expertise of a vocational expert and to do so without requiring the expert to lay a further foundation about the sources that the expert has consulted in order to arrive at the expert's job-number information."); Debiase, 2019 WL 5485269, at *11 ("An identification of the general sources and consideration of the experience and expertise of the vocational expert suffices; the ALJ need not inquire into the vocational expert's precise methodology."). Additionally, plaintiff was provided an opportunity to cross-examine the VE, and to provide supplemental briefing on the issue, which was considered by the ALJ. See Tr. 829; see also Brault, 683 F.3d at 451 (Plaintiff's "attorney had a full opportunity to explain his objections [to the VE's testimony] in significant detail. Nothing more was required.").

Accordingly, the ALJ did not err by relying on the VE's testimony. See Debiase, 2019 WL 5485269, at *11; Lyde, 2018 WL 4678574, at *4; Cortes, 2018 WL 1392903, at *11; Harper, 2017 WL 3085806, at *16.

### 3. Job Incidence Numbers

Plaintiff also argues, based apparently on counsel's own online research, that the job incidence numbers identified by the VE are "a mathematical impossibility." Doc. #23-2 at 14. This Court has previously addressed, and rejected, that same

argument. See Mott, at 36-38. In Mott, the Court found "no basis on which to conclude that the research of counsel is somehow inherently more reliable than the expert testimony" of the VE, and that a "review of publicly available court decisions reveals that ALJs have adopted a wide variety of job numbers for the occupations" at issue in that case. Id. at 36.

The rationale of Mott is equally applicable here. The Court's own review of publicly available court decisions reveals that ALJs have adopted a wide variety of job numbers for the occupations at issue here. As to the job of call center operator (DOT 237.367-014),[19] the Court found recent decisions reporting national job incidence numbers ranging between 7,301 and 140,000, with several reporting numbers similar to that testified to by the VE here. See, e.g., Rousey v. Comm'r of Soc. Sec., 285 F. Supp. 3d 723, 732 (S.D.N.Y. 2018) (50,240); Millett v. Berryhill, No. 17CV07295(PGG)(HBP), 2019 WL 2453344, at *18 (S.D.N.Y. Jan. 11, 2019) (7,301), report and recommendation adopted, 2019 WL 1856298 (Apr. 25, 2019); Shrawna D. B. v. Berryhill, No. 3:18CV01014(EK)(BH), 2019 WL 2124898, at *9 (N.D. Tex. Apr. 22, 2019) (46,320), report and recommendation adopted sub nom. Batty v. Berryhill, 2019 WL 2123531 (May 14, 2019);

---

[19] Some of the below-cited cases refer to this job as "callout operator," as opposed to "call center operator," but nevertheless cite the same DOT code identified by the ALJ in her decision.

Rucker v. Berryhill, No. 16CV01388(RRM)(SMG), 2018 WL 1320660, at *8 (E.D.N.Y. Mar. 14, 2018) (16,509); Henderson v. Colvin, No. 16CV05458(PED), 2018 WL 1229707, at *7 (S.D.N.Y. Mar. 5, 2018) (51,650); Tanner v. Berryhill, No. 2:16CV00226(JCF), 2018 WL 8370730, at *6 (N.D. Ga. Mar. 2, 2018) (39,000); McBride v. Berryhill, No. 17CV00036(MU), 2018 WL 539808, at *5 (S.D. Ala. Jan. 24, 2018) (140,000).

Likewise, as to the job of credit clerk (DOT 205.367-014)[20], the Court found recent decisions reporting national job incidence numbers ranging from 22,700 to 396,000. See, e.g., Kratzer v. Saul, No. 1:19CV00184(RLM), 2020 WL 487148, at *1 (N.D. Ind. Jan. 30, 2020) (101,000); Weed v. Saul, No. 4:18CV01192(SPM), 2019 WL 4451259, at *2 (E.D. Mo. Sept. 17, 2019) (396,000); Johnson v. Berryhill, No. 1:18CV01356(SEL), 2019 WL 2744594, at *6 (N.D. Ohio June 13, 2019) (100,000), report and recommendation adopted sub nom. Johnson v. Comm'r of Soc. Sec., 2019 WL 2743775 (July 1, 2019); Andrew M. v. Berryhill, No. 1:17CV03976(MJD)(RLY), 2018 WL 4090512, at *3 (S.D. Ind. Aug. 27, 2018) (33,000); Tanner, 2018 WL 8370730, at *6 (58,800); Milne v. Berryhill, No. 5:17CV01042(SHK), 2018 WL 3197749, at *7 n.3 (C.D. Cal. June 27, 2018) (22,700); White v.

---

[20] Again, the below-cited cases do not consistently refer to this job by the title "credit clerk." Accordingly, the Court has relied on authority referencing DOT Code 205.367-014.

Berryhill, No. 3:16CV00774(DJN), 2017 WL 4159655, at *7 (E.D. Va. Sept. 19, 2017) (38,500). The job incidence numbers identified by the VE for "credit clerk" (40,000), and relied on by the ALJ, are well within this range.

"Neither the Social Security Act, nor the Commissioner's Regulations or Rulings provide a definition for a 'significant' number of jobs." Koutrakos v. Colvin, No. 3:13CV01290(JGM), 2015 WL 1190100, at *21 (D. Conn. Mar. 16, 2015) (collecting cases); see also, e.g., Gutierrez v. Comm'r of Soc. Sec., 740 F.3d 519, 528 (9th Cir. 2014) (25,000 jobs in national economy "significant"); Rogers v. Astrue, 312 F. App'x 138, 142 (10th Cir. 2009) (11,000 jobs in national economy "significant"); Johnson v. Chater, 108 F.3d 178, 180 (8th Cir. 1997) (10,000 jobs in national economy "significant"). While there is no bright-line rule, "courts have generally held that what constitutes a 'significant' number is fairly minimal, and numbers" in the range of 10,000 jobs nationally "have typically been found to be sufficiently 'significant' to meet the Commissioner's burden." Sanchez v. Berryhill, 336 F. Supp. 3d 174, 177 (W.D.N.Y. 2018) (citations and quotation marks omitted); see also Debiase, 2019 WL 5485269, at *10 ("[C]ourts are generally guided by numbers that have been found 'significant' in other cases, and courts within the Second Circuit have generally found that what constitutes a

54

'significant' number of jobs is fairly minimal." (citations and quotation marks omitted)).

Thus, even if plaintiff is correct that the call center operator and credit clerk job incidence numbers provided by the VE were inflated, any error would be harmless, as these jobs have been found to be available in the national economy in numbers that are clearly "significant." Accordingly, the Court declines to find that plaintiff's independent research undermines the VE's testimony as to job incidence numbers.

### 4. The Hypothetical Posed to the VE

Finally, plaintiff asserts that "the ALJ's hypothetical question was itself defective." Doc. #23-2 at 15. Defendant responds, in pertinent part, that "the ALJ's step five finding is supported by substantial evidence because it was based on the vocational expert's testimony, which considered the RFC the ALJ ultimately adopted." Doc. #27-2 at 22.

"An ALJ may rely on a vocational expert's testimony regarding a hypothetical as long as there is substantial record evidence to support the assumptions upon which the vocational expert based his opinion and accurately reflects the limitations and capabilities of the claimant involved." McIntyre, 758 F.3d at 150 (citation and quotation marks omitted); see also Mancuso v. Astrue, 361 F. App'x 176, 179 (2d Cir. 2010) (upholding an ALJ's hypothetical where "the ALJ's hypothetical mirrored

55

[plaintiff's] RFC, which ... was supported by substantial evidence in the record[]"). Here, the ALJ presented the VE with a hypothetical that reflected the ultimate RFC determination. See Tr. 868-69. As stated, the ALJ properly weighed and considered the evidence of record, and the RFC determination is supported by substantial evidence. Accordingly, the ALJ appropriately relied on the VE's testimony at step five of the sequential evaluation, and there is no error.

## VI.   CONCLUSION

For the reasons set forth herein, plaintiff's Motion to Reverse the Decision of the Commissioner [**Doc. #23**] is **DENIED**, and defendant's Motion for an Order Affirming the Decision of the Commissioner [**Doc. #27**] is **GRANTED**.

SO ORDERED at New Haven, Connecticut, this 22nd day of May, 2020.

/s/
_____
HON. SARAH A. L. MERRIAM
UNITED STATES MAGISTRATE JUDGE
